THE UNITED STATES, APPELLANTS, *v.* ANTONIO MARIA OSIO.

Where an island in the bay of San Francisco, in California, was claimed, not under the colonization law of 1824, or the regulations of 1828, but under certain special orders issued to the Governor by the Mexican Government, and the Governor was alleged to have issued a grant in 1838, the petitioner never took possession or exercised acts of ownership of the island under that decree, which therefore affords no foundation for his claim.

In 1839, a petition was addressed to the Governor, praying for a new title of possession, and it was alleged that a grant was issued, but it does not appear that it was recorded according to law, nor is the testimony satisfactory to show that it was signed by the Governor.

Where no record evidence is exhibited, the mere proof of handwriting by third persons, who did not subscribe the instrument as witnesses, or see it executed, is not sufficient in this class of cases to establish the validity of the claim without some other confirmatory evidence.

The special orders above mentioned were contained in a despatch from the Mexican Government, giving the power to the Governor, in concurrence with the Departmental Assembly.

This provision differs essentially from the regulations of 1828, under which the action of the Assembly was separate and independent, and subsequent to the action of the Governor. But the power conferred by this despatch could not be exercised by the Governor without the concurrence of the Departmental Assembly. Both must participate in the adjudication of the title; and as the Assembly did not concur in this grant, it is simply void.

THIS was an appeal from the District Court of the United States for the northern district of California.

The case is stated in the opinion of the court.

It was argued by *Mr. Stanton* for the United States, and by *Mr. Gillet* for the appellee.

*Mr. Gillet* made the following points:

1. No form of grant is required by the order of the Supreme Government, authorizing the grant of the islands, nor required by the colonization law or regulations.

2. Meritorious, useful, and patriotic services, were good considerations for a grant.

3. Confirmation by the Departmental Assembly is not necessary in order to confirm a California grant made by a Governor. That it was the duty of the Government, and not of the grantee, to present it for confirmation.

4. When an equitable right has once vested under a California grant by the Governor, it cannot be divested, except by the denouncement of a third person legally made.

5. The question of the bona fides of this grant cannot now be raised, as it was not raised below.

6. Conditions subsequent, if not complied with, do not render the grant void, nor authorize the Government to forfeit the grantee's rights to its own use.

7. When an officer of the Mexican Government, who had the legal power to make grants of land, exercises that power in a manner to create a reasonable belief, in the mind of an applicant for a grant, that the instrument given is a grant, and he takes possession, occupies the same, and makes improvements thereon in good faith, such grant, if not in strict legal form, creates an equitable right, which entitles the grantee to a confirmation thereof.

8. By the laws, usages, and customs of Mexico, this claim would have been confirmed, and therefore this court must confirm it.

9. It is a well-settled rule, that equity cannot be resorted to for the purpose of enforcing forfeitures, but only to avoid them.

Mr. Justice CLIFFORD delivered the opinion of the court.

*United States* v. *Osio.*

This is an appeal from a decree of the District Court of the United States for the northern district of California, affirming a decree of the commissioners appointed under the act of the third of March, 1851, to adjudicate private land claims. Every person claiming land in California, by virtue of any right or title derived from the Spanish or Mexican Government, is required by the eighth section of that act to present his claim, together with the evidence in support of the same, to the commissioners in the first instance, for their adjudication.

Pursuant to that requirement, the appellee in this case presented his petition to that tribunal, claiming title to the island of Los Angeles, situated near the entrance of the bay of San Francisco, and praying that his claim to the same might be confirmed. As the foundation of his title, he set up a certain instrument or document, purporting to be a grant of the island to him by Governor Alvarado. It bears date at Monterey, on the eleventh day of June, 1839; and the claimant alleged in his petition to the commissioners that the grant was made under certain special orders issued to the Governor by the Mexican Government. He obtained a decree in his favor before the commissioners, and the District Court, on appeal, affirmed that decree; whereupon an appeal was taken, in behalf of the United States, to this court; and the question now is, whether the claim, upon the evidence exhibited, is valid, within the principles prescribed as the rule of decision in the eleventh section of the act requiring the adjudication to be made.

Unlike what is usual in cases of this description, it will be noticed that none of the documentary evidences of title introduced in support of the claim purport to be founded upon the colonization law of 1824, or the regulations of 1828; and for that reason we shall refer to these documents with some degree of particularity, in order that their precise import and effect may be clearly understood.

On the seventh day of October, 1837, the present claimant presented a petition to Governor Alvarado, praying for a grant of the island in question, "to build a house thereon, and breed horses and mules;" representing, in his petition, that as early

as 1830 he had made a similar request, and expressing the hope that the grant might be made.

Some further delay occurred in the contemplated enterprise of the petitioner, as appears from the fact that no action was taken on his second petition until the first day of February, 1838, when the Governor, by an order appearing in the margin of the petition, referred it, not to the alcalde of the district, but to the military commandancy north of San Francisco, for a report. That office was filled at the time by Mariano G. Vallejo, who accordingly reported, on the seventh day of the same month, that the island might be granted to the petitioner; but suggested that it would be well to made an exception in the grant, to the effect that, whenever the Government might desire or find it convenient to build a fort on the principal height thereof, it should not be hindered from so doing. With that report before him, the Governor, on the nineteenth day of February, 1838, made a decree, wherein he states that he had concluded to grant to the petitioner the occupation of the island in question, " to the end that he may make such use of it as he may deem most suitable, to build a house, raise stock, and do everything that may concern the advancement of the mercantile and agricultural branches—upon the condition that, whenever it may be convenient, the Government may estab-lish a fort thereon."

Direction was given to the petitioner, by the terms of the instrument, to present himself, with the decree, not to the office where land adjudications under the colonization laws were usually recorded, but to the military commandancy, that an entry thereof might be made, for the due verification of the same.

No such note of the proceeding was ever made in the office of the military comandante, or in any book containing the adjudications of land titles. But the several documents are duly certified copies of unrecorded originals which were found in the Mexican archives. Their genuineness is controverted by the counsel for the appellants; but we do not think it necessary to consider that question on this branch of the case, for the reason that the petitioner never took possession of the

island under that decree, and does not claim title under it in the petition which he presented to the land commissioners.

All that the decree purports to grant to the petitioner, in any view which can be taken of it, is the right or license to occupy the island for the purposes therein described, subject to the right of the Government to enter at any time and appropriate the premises as a site for a military fort; and inasmuch as the petitioner never availed himself of the license granted, or made any improvements on the island under the decree, it is quite clear that he had acquired no interest in the land, by virtue of that proceeding, at the date of the cession to the United States, which the Mexican Government was bound to respect.

Four other documents were introduced by the petitioner, before the commissioners, in support of his claim: 1. A despatch from the Minister of the Interior of the Republic of Mexico, addressed to Governor Alvarado. 2. A petition from the appellee to the same. 3. A duplicate copy of the grant set up in his petition to the commissioners, which is without any signatures. 4. The original grant of the island in question, which purports to be signed by the Governor, and to be countersigned by the secretary. Of these, the first three are duly-certified copies of unrecorded originals which were found in the Mexican archives.

As exhibited in the transcript, the despatch bears date at Mexico, on the twentieth day of July, 1838. By that despatch the Governor was informed that "the President, desiring on the one part to protect the settlement of the desert islands adjacent to that Department, which are a part of the national territory, and on the other to check the many foreign adventurers who may avail themselves of those considerable portions, from which they may do great damage to our fishery, commerce, and interests, has been pleased to resolve that your Excellency, in concurrence with the Departmental junta, proceed, with activity and prudence, to grant and distribute the lands on said islands to the citizens of the nation who may solicit the same."

In addition to what is here stated, two persons, Antonio

and Carlos Carrillo, are named in the communication, to whom, on account of their useful and patriotic services, preference was to be given in making the grants, to the extent of allowing them to select one exclusively for their benefit.

Such is the substance of the despatch, so far as it is material to consider it in this investigation.

On the fifteenth day of February, 1839, the present claimant presented to Governor Alvarado another petition, wherein, after referring to the fact that the island in question had been granted to him during the preceding year, for the breeding of horses, he prays that a new title of possession may be given to him, in accordance with the superior decree, which, as he assumes, empowered the Governor to grant, for purposes of colonization, the islands near by, on the coast.

Some idea of the situation of the island, and of the importance which was attached to it in a military point of view, may be gathered from the exposition of the military comandante, made to the Governor on the seventeenth day of August, 1837. One of the purposes of that report was to recommend that the custom-house established at Monterey should be transferred to the port of San Francisco. Various reasons were assigned for the change; and among others, it was stated that the latter port was impregnable, by reason of its truly military position.

After describing the port, and expatiating upon the advantages which would flow from the transfer, the report goes on to state, that near its entrance and within the gulf are several islands, where are found water and a variety of timber most suitable for a fortification; adding, that it contains safe anchorages and suitable coves for landing goods and for store-houses, particularly the island of Los Angeles, which is one league in circumference, lying at the entrance of the gulf, and forming two straits with their points—giving their names—so that it is the key of the whole of it, inasmuch as from this very place the coming in or going out of vessels can be prevented with the utmost facility.

Suffice it to say, without repeating any more of its details, that the whole report is of a character to afford the most convincing proof that the public authorities of the Territory, as

early as August, 1837, fully appreciated the importance of the island, as a necessary site to be retained by the Government for the purposes of national defence. Arch. Exh., p. 5.

Grants under the colonization laws were usually issued in duplicates—one copy being designed for the party to whom it was made, and the other to remain in the archives, to be transmitted, with the expediente, to the Departmental Assembly for its approval. They were in all respects the same, except that the copy left in the office, sometimes called the duplicate copy, was not always signed by the Governor and secretary, and did not usually contain the order directing a note of the grant to be entered in the office where land adjudications were required to be recorded.

In this case there is no expediente, other than the one presented with the first-named petition, which is not necessarily or even properly connected with the grant set up by the claimant. Two copies of this grant were produced by the petitioner, both bearing date at Monterey, on the eleventh day of June, 1839, nearly two years after the Governor received the before-mentioned exposition of the military comandante, showing the importance of the island to the Government as a site for works of defence. They are of the same tenor and effect, and both purport to be absolute grants, without any of the conditions usually to be found in the concessions issued under the colonization laws. As before remarked, the copy not signed, together with the petition, were found in the Mexican archives; but the original, properly so called, was produced from the custody of the party.

Adjudications of land titles were required by the Mexican law to be recorded. That requirement, however, was regarded as fulfilled, according to the practice in the Department of California, when a short entry was made in a book kept for the purpose, specifying the number of the expediente, the date of the grant, a brief description of the land granted, and the name of the person to whom the grant was issued. In this case there is a certificate appearing at the bottom of the instrument to the effect that such an entry had been made, but it is wholly unsupported by proof of the existence of any such record.

An attempt was made before the commissioners, or in the District Court, to account for the absence of such record evidence, by showing that a book of Spanish records, of the description mentioned, was consumed by fire, at San Francisco, in 1851; but the recollections of the witness called for the purpose are so indistinct, and his knowledge of the contents of the book so slight, that the evidence is not entitled to much weight. Jimeno, who signed the certificate, was not called, and, in view of all the circumstances, there does not appear to be any ground to conclude that any such record was ever made.

Colonization grants were usually made, subject to the approval of the Departmental Assembly, and the regulations of 1828 expressly declare that grants to individuals and families shall not be held to be definitively valid without the previous consent of that deputation. No such approval was ever obtained in this case; and it does not appear that the despatch, or order, as it is denominated by the Governor, was ever communicated by him to the Departmental Assembly, until the twenty-seventh day of February, 1840. His message communicating the despatch, though brief, clearly indicates that the members of the Assembly had no previous knowledge upon the subject.

A document, purporting to be an unsigned copy of the grant, and the petition, are all the papers that were found in the archives, except those connected with the first proceeding under which the license to occupy the island was granted. They were loose papers, not recorded, or even numbered, and, in view of all the circumstances, add little or nothing to the probability in favor of the integrity of the transaction. Two witnesses were examined by the claimant to prove the authenticity of the grant. Governor Alvarado testified that his signature to the grant was genuine, and that he gave it at the time of its date. In effect the other witness testified that he was acquainted with the handwriting of the Governor, and also with that of the Secretary, and that they were genuine. Where no record evidence is exhibited, the mere proof of handwriting by third persons, who did not subscribe the in-

strument as witnesses, or see it executed, is not sufficient in this class of cases to establish the validity of the claim, without some other confirmatory evidence. But the testimony of Governor Alvarado stands upon a somewhat different footing. His statements purport to be founded upon knowledge of what he affirms, and if not true, they must be wilfully false, or the result of an imperfect or greatly impaired and deceived recollection. Resting as the claim does in a great measure, so far as the genuineness of the grant is concerned, upon the testimony of this witness, we have examined his deposition with care, and think proper to remark that it discloses facts and circumstances which to some extent affect the credit of the witness. By his manner of testifying, as there disclosed, he evinces a strong bias in favor of the party calling him, as is manifested throughout the deposition. Some of his answers are evasive; others, when compared with preceding statements in the same deposition, are contradictory; and in several instances he refused altogether to answer the questions propounded on cross-examination. Suffice it to say, without entering more into detail, that we would not think his testimony sufficient without some corroboration to entitle the petitioner to a confirmation of his claim.

On the part of the United States the confirmation of the claim is resisted chiefly upon two grounds. It is insisted, in the first place, that the evidence introduced by the claimant to establish the authenticity of the grant is not sufficient to entitle him to a confirmation, and that in point of fact the grant was fabricated, after our conquest of the territory. Secondly, it is contended that the grant, even if it be shown that it is genuine, was issued by the Governor without authority of law.

In support of the first proposition, various suggestions were made at the argument, in addition to those which have already been the subject of remark. Most of them were based upon the state and condition of the title papers, the circumstances of the transaction, and the conduct of the parties, as tending to show the improbability that any such grant was ever made. Much stress was laid upon the fact that the grant was never approved by the Departmental Assembly, or any note of it

entered in the office where the adjudications of land titles were required to be recorded. Attention was also drawn to the fact that the paper produced as the expediente is without any number, which circumstance, it was insisted, furnished strong evidence that they were fabricated, or at least that they had never been completed. To support that theory, an index, prepared by the secretary, and found in the Mexican archives, was exhibited, containing a schedule of expedientes numbered consecutively from one to four hundred and forty-three, covering the period from the tenth day of May, 1833, to the twenty-fourth day of December, 1844, and including in the list one in favor of this petitioner for another parcel of land granted on the seventh day of November, 1844. Reliance was also placed upon the omission of the appellee to call and examine the secretary who prepared that index, and whose name purports to be signed to the grant set up in the petition. Another suggestion was, that, from the nature of the property, it was highly improbable that any private person should desire such a grant in a Department where there were vast tracts of fertile land to be obtained for the asking, and that it was past belief that the Governor would have been induced to make the grant, especially after the receipt of the exposition of the military comandante, except upon the same conditions as those inserted in the decree of the preceding year. Every one of these suggestions is entitled to weight, and when taken together and considered in connection with the unsatisfactory character of the parol proof introduced by the petitioner, they are sufficient to create well-founded doubts as to the integrity of the transaction. But it is unnecessary to determine the point, as we are all of the opinion that the second objection to the confirmation is well taken, and must be sustained.

Nothing can be plainer than that the Governor, in making the grant in question, did not assume to act under the colonization law of 1824, or the regulations of 1828. Were anything wanting beyond what appears in the terms of the grant to establish that proposition, it would be found in the deposition of the Governor himself, in his answer to the fourth interrogatory propounded by the claimant. His answer was, that he

made the grant by an express order in writing from the General Government. He further states, that his predecessors had applied to the General Government for such authority, but without success. On coming into office, he renewed the application, and, after considerable delay, he says he received the before-mentioned despatch by the hands of a courier.

Neither side, in this controversy, disputes the authority of the Mexican President to issue the order contained in the despatch. From its date, it appears to have been issued during the administration of General Anastasio Bustamente. He succeeded to the Presidency, for the second time, on the nineteenth day of April, 1837, after the capture of Santa Anna in Texas, and remained in office until the sixth day of October, 1841, when he was driven from the capital by the partisans of his predecessor.

At the beginning of his administration, he professed to be guided by the principles of the Constitution; and from the well-known antecedents of his Cabinet, he could hardly have expected to adopt any different policy. His Cabinet, however, shortly resigned, and a new one was formed, believed to have had much less respect for the fundamental law. On the ninth day of March, 1838, the Minister of the Interior of the new Cabinet resigned, when Joaquin Pesado, whose name is affixed to this despatch, was appointed in his place.

After the new Cabinet was organized, the policy of the administration was changed; and it cannot be doubted but that, at the date of this despatch, the President had assumed extraordinary powers, and was in point of fact, to a considerable extent, in the exercise of the legislative as well as the executive powers of the Government.

Assuming that the despatch was issued in pursuance of competent authority, it must be considered as conferring a special power, to be exercised only in the manner therein prescribed. In this view of the subject, it is immaterial whether the power to grant the islands on the coast was vested in the Governor before or not, or in what manner, if the power did exist, it was required to be exercised, as the effect of this order, emanating from the supreme power of the nation, was to repeal the pre-

vions regulations upon the subject, and to substitute a new one in their place.

Strong doubts are entertained whether the islands situated immediately in the bay of San Francisco are either within the words of the despatch or the declared purpose for which the power was conferred; but it is unnecessary to determine that point in this investigation.

Waiving that point at the present time, we come to consider the question whether, upon the proofs exhibited, the power was exercised in this case in a manner to give validity to the grant; and that inquiry necessarily involves the construction of the despatch.

Omitting the formal parts, its effect was to authorize the Governor, in concurrence with the Departmental Assembly, to grant and distribute the lands on the desert islands adjacent to the Department to the citizens of the nation who might solicit the same. By the terms of the despatch, the power to grant and distribute such lands was to be exercised by the Governor, in concurrence with the Departmental Assembly; by which we understand, that the Assembly was to participate in the adjudication of the grant. Whenever a petition was presented, the first question to be determined was, whether the grant should be made and the title-papers issued; and, by the plain terms of the despatch, an affirmative adjudication could not be legally made, without the consent of the Departmental Assembly. Whether a subsequent ratification of the act by the Assembly might not be equivalent to a previous consent, is not a question that arises in this case, for the reason that no such ratification ever took place.

All we mean to decide, in this connection, is, that by the true construction of the despatch, the act of adjudication cannot be held to be valid without the concurrence of the Departmental Assembly, as well as that of the Governor.

In this respect, the provision differs essentially from that contained in the regulations of 1828, under which the approval of the Assembly was an act to be performed after the expediente had been perfected, and after the incipient title-papers had been issued by the Governor. His action pre-

ceded that of the Assembly, and in contemplation of law was separate and independent. After the grant was made and executed by the Governor, and countersigned by the Secretary, it was the duty of the Governor to transmit it to the Departmental Assembly, for its approval; and if it was not so transmitted, it was the fault of the officer, and not of the party.

Other differences between the regulations of 1828 and the provisions of that despatch might be pointed out; but we think it unnecessary, as those already mentioned are deemed to be sufficient to show that the decisions of this court, made in cases arising under those regulations, have no proper application to the question under consideration.

From the words of the despatch, we think it is clear that the power conferred was to be exercised by the Governor in concurrence with the Departmental Assembly; and, consequently, that a grant made by the Governor without such concurrence was simply void. This view of the question finds support in the Mexican law defining the functions and prescribing the duties of the Governor, and those of the Departmental Assembly. That law was enacted on the twentieth day of March, 1837, and continued in force during the administration under which this despatch was issued. 1 Arrillago Recop., vol. 1, pp. 202 and 210. Many duties were devolved, by that law, upon the Governor, and also upon the Departmental Assembly, where each was required to act independently of the other. But other duties were prescribed, in the performance of which the Governor and the Assembly were required to act in concurrence. In the latter class, the Governor could not act separately, though in some instances it was competent for the Assembly to act in his absence.

Concurrent duties, it seems, were usually performed in open session, in which the Governor, when present, presided; but he had no vote, except when, from absence or otherwise, the members present were equally divided. The Assembly consisted of seven members, chosen by the electors qualified to vote for deputies to the general Congress.

Those in charge of the Supreme Government, or some of them, had been much in public life, and it must be presumed

that the despatch under consideration was not framed without some reference to that law. On examining the words employed in the law, to express and define concurrent action, and comparing them with the words of the despatch translated " as in concurrence with," we find they are the same in the original language. Further support to the construction here adopted is derived from the declared purpose of the despatch, as appears in its recitals. Mexican authorities had long dreaded the approach of foreigners to her western coast, and the language of the despatch shows that its great and controlling purpose was to promote the settlement of the unoccupied islands by trustworthy citizens of the nation, with a view to ward off that apprehended danger. They feared that those islands, especially those further south and nearer to the track of commerce into the Pacific ocean, might become the resort of military adventurers, and be selected by those desirous of invading that remote Department as places of rendezvous or shelter; and in the hope of averting that danger, or, in case of its approach, of supplying the means of timely information, they desired that their own citizens might preoccupy those exposed positions. In this view of the subject, the President, no doubt, regarded the power to be exercised under the despatch as one of importance and delicacy; and might well have desired to prescribe some check upon the action of the Governor; and if so, it would have been difficult to have devised one more consonant with the then existing laws upon the general subject, or better suited to the attainment of the object in view, than the one chosen in this despatch.

For these reasons, we are of the opinion that the Governor, under the circumstances of this case, had no authority, without the concurrence of the Departmental Assembly, to make this grant. Whether the persons specially designated in the despatch as the fit subjects for the bounty of the Government stand in any better situation or not, is not a question in this case. Having come to the conclusion that the grant is void, it does not become necessary to consider the evidence offered to prove possession. On that point, it will be sufficient to say, it is conflicting and unsatisfactory; and if true, is not of a

character to show any right or title in the land under the Mexican Government, or any equity in the claimant, under the act of Congress requiring the adjudications to be made.

The decree of the District Court is therefore reversed, and the cause remanded with directions to dismiss the petition.