UNITED STATES *vs.* KNIGHT'S ADM'R.

1. A complete espediente in a land title according to the laws and customs of Mexico consists of a petition with deseño annexed, order of reference, decree of concession, and copy of the grant.

2. Where there is no map annexed to the petition, no order of reference, or informé, but the decree of concession follows immediately after the petition, the inference is a reasonable one that no order of reference or informé was ever made in that case.

3. Where the decree of concession appears to have been made without an informé *upon that petition*, and yet recites an informé as having been made by a certain alcalde, and that alcalde did actually make an informé *upon another petition* to a former governor, the presumption is that the recital refers to the informé actually made.

4. If the informé was originally *adverse* to the petitioner, but was altered after the conquest so as to make it a *favorable* report, and it is recited in the decree as a favorable report, the inference is that the decree was not made until after the alteration, and consequently not until after the conquest of the country.

5. The fact that an espediente is included in an index made by an American officer in 1847 and 1848 shows that it was in the archives when that index was made, but it shows nothing more. The index cannot in any sense be regarded as a Mexican record.

6. The papers of the espediente in question not being previously filed,

numbered, or indexed by Mexican authority, and no fact appearing to show when or by what means they came into the Surveyor General's office, evidence that the grant was recorded is entirely wanting.

7. The fact that a grant bearing date 4th May, 1846, was not sent by the Governor to the Departmental Assembly for approval among the others which were so sent on the 3d and 10th of June, is entitled to very considerable weight as a circumstance against the authenticity of the grant.

8. Assuming it to be competent to establish a title without record evidence, still the burden is on the claimant to prove that the grant was issued, and he cannot give parol evidence of its contents without first proving its existence and loss.

9. But a claim cannot be confirmed without record evidence.

10. To maintain a title by means of secondary evidence, the claimant must show that the grant was obtained and made in the manner required by law, and that it was recorded in the proper public office.

11. Evidence that a book or other record is lost cannot avail a claimant unless it be also proved that the grant under which the claim is made was duly and properly entered on the lost record.


This was an appeal by the United States from the decree of the District Court for the northern district of California. The appellee (Morehead) was administrator of Wm. Knight, and in that character he presented his petition on the 3d day of March, 1852, to the board of commissioners for the investigation of private land claims, agreeably to the act of Congress passed March 3, 1851. The commissioners rejected the claim, and the petitioner appealed to the District Court, where it was confirmed. The claim was for ten leagues (*sitios de gañada mayor*) of land, situate on the western bank of the Sacramento, including the region lying between that river and the arroyo Jesus Maria, and being a large part of what is now the county of Yolo.

The title averred in the petition as the basis of the claim was a grant from Pio Pico, Governor or Political Chief of both the Californias, dated on the 4th of May, 1846. The claimant produced certain papers from the Surveyor General's office.

The first purported to be a petition addressed by William Knight to the Governor, bearing date at Sonoma, on the 1st day of February, 1846, describing the land, setting forth the necessities of his family as a reason for the appropriation of it to him by the superior authority, and soliciting the concession in the ordinary form. On the margin of this was written a short note, "Granted as prayed by the petitioner," with an order that a title be issued. This was signed "*Pico.*" Immediately following the petition was a formal and very full decree of concession, dated Angeles, May 4, 1846, to which was attached the full name of *Pio Pico*, with his rubric; and it was attested by *José Matias Moreno*, as secretary. To these documents was added a borrador of a grant, also dated May 4, 1846. Several lines of this borrador had been written and a break made, when the writer (the same, or some other) commenced again at the beginning and wrote to the end of it. The names of the Governor and secretary at the foot of the borrador were admitted not to be in their hands; but Nicholas Den, who had been a magistrate in California before the conquest, and John W. Shore, a clerk in the Surveyor General's office, testified that they were acquainted with the handwriting of Pio Pico, and believed his signature to the marginal order and decree of concession to be genuine. Moreno himself was also called, and he swore that he recollected Knight's presentation of his petition in May, 1846. He was shown a copy of the espediente, and said he believed it was a copy of the decree of concession and of the original grant. The decree he declared was made and signed by the Governor, and the title was *issued* and delivered to Knight by himself as secretary, in which occupation he continued until 1848. But he assigned no dates to the making of the decree or the issuing of the title, or to the delivery of it, nor did he say that the grant was signed by the Governor, or recorded in any book, or that the espediente had been filed in the secretary's office. There was no map, no order of reference to any local magistrate or subordinate officer, and no *informé* in the espediente. But the petition refers to a map, and the decree of concession, as well as the borrador of the grant, recites a report from the first alcalde of Sonoma.

These papers were among the espedientes arranged, numbered, and indexed in the years 1847 and 1848 by W. E. P. Hartnell. Mr. Hartnell was the clerk or assistant of Capt. Halleck when the latter was secretary for the military government established by Gen. Kearney after the taking of Monterey. Capt. Halleck was a witness in this cause, and deposed that, besides the records which were brought up from Los Angeles, a large quantity were found lying on the floor of the custom-house at Monterey and piled up against the wall, which were by himself and Mr. Hartnell placed among the records of the office. Private individuals also brought papers there and had them filed, but he or Hartnell always endorsed on these private papers the time at which they were deposited. Capt. Halleck's testimony does not disclose his reasons nor those of Hartnell for believing that the papers found in the custom-house were land records of the Mexican Government.

To prove the loss of the original grant and excuse its non-production, the claimant took the deposition of Samuel Brannon, who testified that in 1847 Knight came to San Francisco from the lower country, where he had been bearing despatches for the Government, and that he told the witness of an attempt made (he did not say when or where) by the Sanchezes (native Californians) to lasso him, in consequence of which, and of his fast riding to escape them, he had lost his title papers. But he did not describe or allude to any particular paper as being lost.

The evidence showed that Knight was a native of the United States, had gone to New Mexico as early as 1830, where he had married "a daughter of the country," and emigrated thence to California about 1842. In 1843 he seated himself and his family on the right bank of the Sacramento, at a place since called "Knight's Landing," and within the limits of this claim. In that year, or the year after, he built himself a house, and in 1845 he had a wheat-field of five or six acres under cultivation. In 1846 he had a garden of two or three acres near his house planted with corn and melons. He left his home early that summer, was in the Bear Flag insurrection, and joined the American army soon after its first appearance

on the coast. He served during the war, and died in 1849, at the gold mines on the Stanislaus river.

Knight's relations with the Departmental Government of California before and after Pico's accession to power were shown by testimony taken in the cause, and by reference to historical and official documents. In 1842, very soon after he came into the country, he solicited Micheltorena for a concession of the same land which is now claimed. His petition was successively referred to the Prefect of Monterey, the judge of New Helvetia, and the First Alcalde of Sonoma, the last of whom reported against him on the ground that the land solicited had been previously conceded to, and was then occupied by, Don Thomas Hardy. Micheltorena never gave him any grant. He joined the standard of that chief in the autumn of 1844, when his authority was resisted by Pico and his partisans in the south. But he was not included within the terms of the general title which Micheltorena made to his followers, through Captain Sutter, at Santa Barbara, on the 22d of December, because he had no report from Sutter, and the report which he had from the Alcalde of Sonoma was adverse to him. Nevertheless Sutter, on the 15th day of April, 1845, gave him a copy of the general title, believing him (as he swore) entitled to the land for his military services under Micheltorena against Pico, the latter of whom was in power as political chief of the Department at the time when the copy was so delivered. After receiving this copy of the general title, and after the conquest of the country by the Americans, Knight, on the 8th October, 1847, got Jacob P. Leese (who had been the First Alcalde. of Sonoma in 1844) to alter his informé by inserting into it the words "*una parte de ella*," and procured from Hardy and Leese certificates that the land solicited by him in 1844 did not interfere with Hardy's ranch, as Leese had then reported. He sought the advice of several friends on the value of this title, and often incidentally spoke of it to others, but to none of them did he show or mention any except the Sutter title, unless to *Colonel Fremont*, who does not recollect the papers he exhibited nor the Governor under whose grant he claimed, but "thinks he rather spoke of Pio Pico." The papers from Micheltorena

and Sutter were found in the possession of his family after his death. They knew of no others. The hostility of Knight to the Pico government was like that of the other American settlers in the north—uniform and consistent. Captain Gillespie stated in his deposition that the causes of the Bear Flag war were in operation from the time of Fremont's appearance on the frontier in March, 1846, and Colonel Fremont himself testified that Knight was prominently engaged in the insurrection from the beginning, but not ostensibly so, for he was employed in the month of May as a spy.

Harrison Gwinn deposed to a conversation with, William McDaniel, (who, at one time, prosecuted this claim,) in which the latter said that when he took hold of the case there were no papers, but he had made out as good a set of papers as there was to any grant of land in California. McDaniel being produced by the claimants, positively contradicted the testimony of Gwinn. He said that he had seen certain papers at Benicia with Knight's name upon them, but not being able to read Spanish, he could make nothing of them.

James M. Harbin swore that Knight was at Los Angeles three weeks in the spring of 1846, and left there the first week in May. Nicholas Den declared in his deposition that he had seen him at Santa Barbara in March, April, or May, going to and returning from Los Angeles. Both these witnesses say that Knight told them he had received a title from Pio Pico. On the other hand, Major Bidwell, Captain Sutter, Major Gillespie, Samuel Neal, Colonel Fremont, William Bartee, S. W. Chase, William Gordon, Nicholas Algier, John Grigsby, testified more or less directly to facts wholly inconsistent with the probability that he could have been at Los Angeles at the date of the alleged grant. The unusual height of the waters (they swore) would have made the journey extremely difficult. The hostile relations between the government at Los Angeles and the American settlers on the Sacramento would have made it perilous for one of them to travel in the South, and some of the witnesses swore that they knew him to be at home during the months of April and May. It did not appear that he ever spoke of having made such a journey.

*United. States* v s. *Knight's Adm'r.*

*Mr. Shunk,* of Pennsylvania, for the United States. 1. Without record evidence this claim cannot be confirmed. The papers produced by the claimant, and called an espediente, are not records. No witness has ever traced them to the custody of the Mexican officials, who kept the archives of California before the conquest. They are indexed, it is true, by Hartnell, who was a translator in the office of the Secretary of State in 1848. But Hartnell was nothing but an American clerk, and the fact that he covered these papers with a wrapper, endorsed them as an espediente, gave them a number, and noted them in an Index, goes no farther to prove them records than would the like scribbling of any clerk in the Surveyor General's office of our own day. Hartnell's endorsement proves that these papers existed at the time he made his Index, but nothing more. They bear no official impress, made by Mexican hands during the days of the Mexican rule. All the dignity and value they have they got from Hartnell, whose endorsement could not transmute worthless papers into records.

2. Granting them to be records, they do not prove that a valid title was issued to Knight. There is no order of reference, no informé, no map. Knight asks for ten leagues of land; Pico grants it. The papers, if they prove anything, simply prove that Pico defied the law. Mexican Colonization Law of 1824; Regulations of 1828; *United States* vs. *Cambuston,* (20 How., 59;) *United States* vs. *Fuentes,* (22 How., 443.)

3. There is no evidence that any grant was ever delivered to Knight. Moreno, the secretary, who is the only witness to this point, is laid out of the case by Judge Hoffman as being unworthy of belief. Moreover, it is proved that Knight was not and could not have been in Los Angeles at the time it is pretended this grant was delivered.

4. Knight was the most unlikely person in the world to get such a grant from Pio Pico. He had been an active and open follower of Micheltorena, and belonged to a class of people who hated Pico, and were hated by him in return. Only a year before the date of this pretended grant, he was in arms

against Pico, under Micheltorena, and within two weeks after- its date, was in arms against him under Fremont. Pico made no grant to any adherent of Micheltorena, and to this rule Knight was the last man to be made an exception.

5. Knight never occupied the land after the date of this grant in compliance with its terms. He cultivated a few acres very carelessly, and at long intervals. But he even ceased this little farming from the date of his grant, and virtually abandoned the ranch.

6. All Knight's acts and declarations from the date of this pretended grant to the day of his death are utterly at variance with the idea that he had any such title. He never claimed under it, spoke of it, or exhibited it; but claimed under, spoke of, and often exhibited another title. Even his wife does not appear ever to have heard of it until after his death.

*Mr. Stanton*, of Washington city, and *Mr. Sunderland*, of California, for the appellee. 1. The espediente is found among the archives, and bears every mark of genuineness. The signatures of the Governor and Secretary are proved to be genuine, and paper, ink, and every mark by which forgery can be detected, in this case bear comparison with papers in the archives of the same date and of undoubted authenticity. The fact that the espediente is incomplete is a strong circumstance in its favor. If manufactured, the papers, in form, would have been perfect. The grant itself would have been found, or a new one made from the copy on file.

2. This espediente was in the archives early in 1847, as is shown by Hartnell's Index, and by the testimony of Halleck in relation to the method of making that Index. It would have been difficult and almost impossible to introduce papers into the archives by stealth while they were in the custody of Halleck and Hartnell, and where documents were deposited by private persons the fact and date of such deposit were endorsed upon them at the time. The papers in this case bear no such endorsement. The Hartnell Index is a document of high authority. Mr. Hartnell was a man of unquestionable integrity,

an accomplished Spanish scholar, and no man in California, with the exception of his brother-in-law Jimeno, was better acquainted with the Mexican laws and Mexican records.

3. It is not unlikely that Pio Pico would have made a grant to Knight on the 4th of May, 1846, but very improbable that he would have made one after that time. Knight had married a Mexican woman, was almost a Mexican himself, and had frequently been employed by the Government. Pico was, therefore, likely to conciliate him and endeavor to secure his friendship by a grant, in view of the difficulties which surrounded the Government in May, 1846. After Knight had joined the Bear Flag and helped to drive Pico out of the country, the idea that he would reward him with an ante-dated grant for these services against himself is preposterous. Moreover, Pico and Knight never met after May, 1846. Knight never had access to the archives after the time when he might have got a grant from Mexico if Pico had sent him one; nor did he introduce the espediente in this case among the archives, because he never referred to it. Having lost his grant, he seemed ignorant to the last that there was any record which might serve him in its stead. The opponents of the claim ought to present some theory of their own to show when, by whom, and how the grant was made, if not made as the claimant alleges.

4. The delivery of the grant is proved by Moreno, and the fact that Knight was in Los Angeles on the 4th of May, 1846, by Harbin. Den saw him on his way there and back, and Davis saw him at the "Buttes" on his return. Moreno, unfortunately for many honest claimants whose grants he attested, is unworthy of belief. But in this case he is fully corroborated.

5. The attempt of the Government to prove that Knight was at home at the date of his grant, and could not have made the journey to Los Angeles on account of the floods, is a failure. Those witnesses who swear that he was at home in May fix the time by circumstances which have no connection with the year 1846, and may have happened just as well in 1847. The rest contradict each other and themselves. The testimony touching the floods avails nothing, for Knight went by the coast route, which was open beyond dispute. The alleged hostility

of the Californians to the American settlers is equally futile as an argument. Knight was a bold and skilful horseman, knew everybody on the road, and carried an unerring rifle. To such a man the dangers of the journey were as nothing.

6. The loss of the original grant is proved by the deposition of Samuel Brannan, to whom Knight told the fact immediately after it occurred, and told it under circumstances which confirmed the truth of his statement.

7. Knight did repeatedly speak of his grant from Pico. He mentioned it to Colonel Fremont, to Davis at the Buttes when he came into the camp, to Harbin at Los Angeles when he got it, and to Den at Santa Barbara on his return home. His omission to speak of it to other witnesses with whom he conversed on the subject after the spring of 1847 is easily explained. He had then lost the grant; he did not know of the espediente in the office, and thought he had no other resource but to fall back on the Micheltorena papers.

*Mr. Black,* of Pennsylvania, in reply. The United States are not bound to explain how or by whom the fraud was concocted or executed. It is sufficient that we show the theory of the claimant to be false. *United States vs. Luco,* (23 How., 515.)

Knight's silence concerning a title from Pico can be accounted for in only one of three ways: (1,) The papers must have been fabricated after his death; or, (2,) before his death, without his knowledge; or, (3,) if they existed in his lifetime, and he knew it, he must also have known that they were false, and was therefore afraid to speak of them, lest he should provoke an inquiry which might result in his detection or exposure.

The mere occupancy of land, without a grant from the nation, gives no title under the Mexican law. It is true that where the record of the grant is lost, and the claimant is driven to secondary evidence, the fact of occupancy, with boundaries marked by the proper officers and permanent improvements in the face of the Mexican authorities, may be strong evidence in aid of the presumption that the title was originally regular,

*United States* vs. *José Castro*, (24 How., 346;) *United States* vs. *Teschmaker*, (22 How., 392.) But where a party comes into court with a grant which he cannot prove, or where he produces one which, on examination, turns out to be spurious or void, there the occupancy of the claimant only shows that he was dishonestly trying to possess himself of that which was not his own. This case, like others of the same class, must turn on the question of title.

Did Knight obtain a grant from Pico on the 4th of May, 1846? If he did, and if he has proved it by evidence from the Mexican records, then there is an end of this controversy; for such evidence is and ought to be conclusive. But these papers have no pretensions to be regarded as records. It is true they are now in the Surveyor General's office, and may have been there as early as 1848, when Mr. Hartnell finished making his Index. That shows only that they were not forged since 1848. They exist now in the office, and existed when they were first seen there, merely as loose papers, not recorded or numbered, and wholly unconnected with any other papers or books which are known to be records. The mere fact that a loose paper is found in a public office does not give to that paper the dignity or entitle it to the faith of a public record without some evidence, intrinsic or extrinsic, to show that it is properly a part of the records. Besides, Captain Halleck's testimony in this case shows that there are many papers now in the Surveyor General's office which never had a place among the Mexican archives. All the real records of land titles are known to have been in the Secretary's office at Los Angeles when the country was taken by the American army. But Captain Halleck lets us know that he and Mr. Hartnell and General Kearney mingled with them a large quantity of other papers found in the custom-house at Monterey, and that their bulk was further swelled by private contributions. It is notorious, too, that many false papers were placed among them at different times by dishonest claimants, for their own fraudulent ends. It is impossible, therefore, to tell whether a loose paper found in the Surveyor General's office comes from the sweepings of the custom-house floor, from the documents

openly deposited by private persons, or from the felonious droppings of those who fabricated them. Limantour's papers were found in a public office. Benito Diaz had his, by some means, placed in the Surveyor General's office. Francisco Pico's espediente was found there ; and Osio appealed, like the present claimant, to what he called " *the archives.*" But those men have been gibbeted in the face of the world as the fabricators of false titles.

Jimeno's Index is a catalogue of genuine espedientes, made before the conquest, by a Mexican officer, who had the means of knowing, and did know, the false from the true. Hartnell's is a list in which the genuine are mingled and confused with the fabricated by an American clerk, who knew not how to distinguish the one from the other. It and its author are alike unworthy of the eulogy pronounced on them by the learned counsel for the claimant. Mr. Hartnell could read, write and speak Spanish. That was his sole qualification. He knew nothing of Mexican laws or records. He was wholly without experience, and the egregious blunder he committed in taking the false papers at the custom-house for land records, shows that he was utterly destitute of judgment.

The journals of the Departmental Assembly prove that this pretended espediente did not exist as a Mexican record. If it had, it would have been included in the forty-five sent into that body on the 8th of June, 1846. There is no reason to believe that any unapproved grant then in the office was withheld by the Governor. *United States* vs. *Bolton,* (23 How.)

No living witness pretends to have seen these papers among the records in the Secretary's office. Pico was not called at all, and Moreno was not asked a question on the subject.

These papers, then, are not records, and that brings the case to a close; for, as a record, if the claimant had one, would be conclusive in his favor, so the want of a record is conclusive against him. This court has pledged itself to confirm no California title on anything short of record evidence.

But it may be worth while to look at the parol evidence in the cause, for the mere purpose of vindicating the wisdom of the rule which excludes it altogether.

Conceding, for the argument's sake, that a public grant for ten leagues of land may be proved by any kind of evidence which will produce a moral conviction on the mind of an impartial judge that the fact is true, how much ought to be required in a case like this? There are several considerations which must be borne in mind here:

1. This belongs to a very suspicious class of California land grants. It bears the name of Pio Pico, and is dated on the eve of the conquest. In *Cambuston's case* the court said that all grants of that kind should be carefully scrutinized. They have been so scrutinized, and not one of them has stood the test. Of nine grants bearing that name, and dated between December, 1845, and July, 1846, and contested here on the ground of fraud, not one has been confirmed. Outside of the forty-five confirmed by the Departmental Assembly this court has never seen a genuine grant of Pio Pico. It will be remembered that Dalton's title was dated the first year of Pico's administration; was found recorded in the Toma de Razon; was among the forty-five, and was admitted to be genuine.

2. Knight was an American settler on the Sacramento, thoroughly identified with the other settlers there, and actively engaged with them in all their movements, political and military, before and at the time, and immediately after the date of this pretended grant. Between Pico's government and the chiefs of his party on the one hand, and those settlers on the other, there was no sentiment but that of bitter hostility. Three times within the space of eighteen months they confronted one another with arms in their hands. The enmity was intensified in March, 1846, by the appearance of Fremont on the frontier, and the readiness of every American (Knight among the number) to join him. At the date of this decree of concession, Knight was in actual rebellion against the authority of the Governor, whose name is signed to it.

3. There are many and obvious marks of falsehood upon the face of the papers. There is no map. The want of an informé is a fatal objection in law to the validity of the grant, and it is also a strong circumstance to show that the whole title is a fabrication. Would Pico have made a grant to a per-

son in such relations with his government without the usual investigations? The recital of an informé is. manifestly false. The informé is not on the back of the petition. Suppose it to have been written on a detached paper, it should be in the espediente. If it was lost, its loss might have been proved. The Alcalde who made it might have been called. In the absence of such proof the court is bound to believe it never existed.

To establish the honesty and good faith of the title in the face of this strong circumstantial evidence against it will require clear evidence, overwhelming·in amount, free from serious contradiction, and perfectly pure in the source from whence it comes. And what have they produced to·show the execution, the delivery, or the recording of the grant?

Covarrubias proves nothing about it. Den and Shore swear only to their opinion of the handwriting, which this court has declared to be inadmissible. The whole weight of the case rests upon Moreno. The value of his testimony need not be discussed, for the counsel of the claimant candidly admit him to be unworthy of belief. There is no other evidence that the grant was executed, delivered, or recorded. If Den and Harbin were believed, it would only show that it was *possible* for Knight to have got a grant in May, 1846. Shall the mere naked possibility that he *might* have got a grant, stand for proof that he *did actually* get one?

But even this possibility is swept away from the claimant by the powerful and irresistible proof that Knight was not at Los Angeles, but at home in the valley of the Sacramento, during the whole spring.

If such a grant was. ever delivered to Knight, why is it not produced? There is no scintilla of evidence to show its loss. Brannan proves only that Knight told him he had *lost his title papers*. This declaration is not evidence of the.fact declared; much less does it prove the loss of a particular paper, which was not mentioned. That he lost any papers· at all must be untrue, for all the title papers he ever had or ever pretended to have were found safe in the custody of his wife, after his death.

This case has all the·bad features in it of the worst cases

that ever came from California. Like *Santillan*, the claimant asserted his right to the land under a different title from that now set up; like *Luco*, he is without record evidence; and like *Diaz*, he is met by a clearly proved *alibi*.

If the claimants had been content to rest the cause upon the papers alone, the claim would have been rejected, not as a manifest forgery, but on the ground of insufficient, illegal, and unsatisfactory proof. But they chose to name the place and the time at which the grant was delivered to Knight—at Los Angeles, on the 4th of May, 1846—and they called Den and Harbin to prove it. This gave to the Government the opportunity of demonstrating the falsehood of the whole story by showing that Knight was not there, but seven hundred miles away, at the time. There cannot be an earthly doubt that the papers are fabricated.

Mr. Justice CLIFFORD. This was a petition for the confirmation of a land claim under the act of the third of March, 1851, and the case comes before the court on appeal from a decree of the District Court of the United States for the northern district of California, reversing the decree of the commissioners, and confirming the claim. William Knight died in October, 1849, and, of course, never presented any claim under that law for confirmation. Administration on his estate was granted to the appellee on the sixth day of November, 1851, and, on the third day of March following, he, as such administrator, filed a petition before the commissioners, claiming a tract of land, called Carmel, situated on the borders of the Sacramento river, and containing ten square leagues. Said tract, as the petitioner represented, was granted to his intestate on the fourth day of May, 1846, by Governor Pio Pico, in the name of the Mexican nation; and was afterwards, during the lifetime of the decedent, possessed and occupied by him pursuant to the grant under which the claim is made. Copies of certain documentary evidences of title were also presented and filed at the same time, and the petitioner represented in effect that he relied on those documents, and such other evidence as he might be able to obtain, to show that the claim

ought to be confirmed. Assuming that the theory of claimant is correct, the title is one, undoubtedly, that ought to be protected; but it is denied by the United States that any such grant was ever made, and that is the principal question in the case. Vacant lands in California belonged to the Supreme Government, and the laws for the disposition of the same emanated from that source. General rules and regulations upon the subject were accordingly ordained, authorizing the Governors of Territories, under certain specified conditions, to grant such lands to such empresarios, families, and single persons as might ask for the same for the purpose of settlement and cultivation; but it was expressly provided that grants made to families or single persons should not be held to be definitively valid, without the previous consent of the territorial deputation. By those rules and regulations, every person soliciting such lands was required, in the first place, to address a petition to the Governor setting forth his name, country, profession, and religion, and also to describe the land asked for as distinctly as possible, by means of a diseño or map, which is usually annexed to the petition. He was not required to prove his representations, but it was made the duty of the Governor to obtain the necessary information to enable him to determine whether the case, as presented in the petition, fell within the conditions specified in the regulations, both as regarded the land and the applicant. Petitions and grants, with the maps of the land granted, were required to be recorded in a book. kept for that purpose, and a circumstantial account of the adjudications was directed to be forwarded quarterly to the Supreme Government. To bring the claim within these rules, the claimant introduced the following documents before the commissioners:

1. A petition, in the usual form, signed by his intestate, bearing date at Sonoma, on the first day of February, 1846, and addressed to Governor Pio Pico.

Recurring to the material parts of the instrument, it will be seen, that the petitioner asked the Governor to grant him "the tract set out in the annexed map," meaning the map annexed to the petition, containing ten sitios de gañada mayor, more

or less; and after describing the tract, and giving the out-boundaries of the same, stated that, according to the annexed report of the magistrate of Sonoma, "there seems to be no obstacle on the part of any one to its concession." No such map, however, as that referred to was annexed to the petition at the time it was introduced; and the espediente contained no report of the Alcalde of Sonoma, or of any other such magistrate.

2. Two decrees, signed by Governor Pio Pico, both dated Angeles, May 4th, 1846, were also introduced by the claimant. One was written, as usual, in the margin of the petition, and was as follows: "Granted, as prayed by the petitioner. Let the title be issued by the Secretary of the Department." But the other, which is signed also by the Secretary, was appended to the petition, without any intervening informé, or order for the same; and yet the recitals of the decree plainly import that the action of the Governor, in making it, was based not only upon the petition, but also upon a report of the Alcalde of the district, as set forth in the petition. Like the preceding decree, it directs that a proper title be issued to the petitioner; and, also, that the espediente be kept, to be submitted to the Departmental Assembly.

He also introduced another document, which was appended to the last named decree, and which purports to be a copy of the "titulo" or grant on which the claim is based. It is dated at the city of Los Angeles, on the fourth day of May, 1846, and is in the usual form.

Failing to produce the original grant, the administrator introduced his own affidavit, to show that he had made diligent search for the same among the papers of the deceased, and elsewhere, and that he was unable to find it. Three witnesses were examined by the claimant before the commissioners; but the commissioners rejected the claim, and the claimant appealed to the District Court. Testimony was taken on both sides in the District Court, and the claimant also introduced certain additional documentary evidences which it becomes important to notice.

Nearly three years before the petition was presented to Governor Pio Pico, the same party, as appears by these documents, had presented a similar petition to Manuel Micheltorena, then holding the office of Governor of California, asking for a grant of the same tract of land. This petition, as then presented, was dated at Monterey on the eighth day of May, 1843, and on the same day the Governor referred it to the Prefect of the district for a report. John A. Sutter was at that time the principal civil officer in that section of the department, and the Prefect accordingly referred the petition to him, directing him to furnish the necessary information; but he referred it to the Alcalde or justice of the peace of Sonoma, for the reason, as stated, that the land was in that district. On the twenty-sixth day of January, 1844, the last named officer reported, to the effect that the land solicited was occupied by virtue of a concession from the Governor in favor of another individual.

That report was duly transmitted to the Governor; and, on the twenty-seventh day of March following, he referred the whole case to Manuel Jimeno, who, on the same day, made a report, recommending that the petition in question, and all similar cases, should be suspended, until the Governor could visit that frontier. Here the matter dropped; and, for reasons which will presently appear, the petition was never again considered.

Certain prominent persons belonging to the department, of whom Pio Pico was one, in the fall of 1844, revolted against the authority of Micheltorena; but John A. Sutter supported the constitutional governor, and was sent by him to collect the militia of the northern frontier, to put down the rebellion. Some of the adherents of the latter had certain claims to lands, and he suggested to the Governor, in the emergency, that grants should be made to them, probably as the most available means to secure their services. Pursuant to that suggestion, the Governor sent to that officer the document known as the "Sutter general title," promising grants to all such claimants as had previously obtained from him a favorable report. According to the testimony of Sutter, the claimant's intestate was prop-

erly included in that category; and he accordingly, on the fifteenth day of April, 1845, gave him the copy of that document, which is exhibited in this record.

Such is the substance of the documentary evidences of title introduced by the claimant. All those relating to the proceedings on the petition presented to Micheltorena, together with the copy of the Sutter general title, were found among the papers of the deceased; but those appertaining to the Pio Pico espediente, except the alleged copy of the grant, are traced copies of originals, now on file in the office of the Surveyor General of California.

It is not pretended that the Sutter general title has any validity, or that the claim in this case can be upheld by the proceedings that took place on the first named petition. Such pretensions, if made, could not be supported, as this court has determined, on several occasions, that the former was invalid; and it is quite obvious that nothing was done by Governor Micheltorena to give any pretence of title whatever to the claimant's intestate.

But it is insisted that the parol proofs, taken in connection with the espediente of 1846, clearly show that Pio Pico, on the fourth day of May in that year, actually issued the grant to William Knight; and that, having proved its execution, delivery, and loss, the claimant is entitled to introduce secondary evidence, to show its contents. Great reliance is placed upon the espediente, as furnishing a ground of presumption that the grant was issued; and, indeed, it is contended, that if it appears that the espediente is genuine, then the grant must be confirmed. Whether the proposition, as stated, be correct or not, it may properly be admitted that the question, as to the *bona fides* of the espediente, is one of very considerable importance in the case. When complete, an espediente usually consists of the petition, with the diseño annexed; a marginal decree, approving the petition; the order of reference to the proper officer, for information; the report of that officer, in conformity to the order, the decree of concession, and the copy or a duplicate of the grant. These several papers—that is, the petition, with the diseño annexed, the order of reference, the

informé, the decree of concession, and the copy of the grant, appended together in the order mentioned—constitute a complete espédiente, within the meaning of the Mexican law.

Three defects are obvious in the document exhibited in the record. There is no map annexed to the petition, and there is neither an order of reference nor an informé; and the inference from the fact that the decree of concession immediately follows the petition is a reasonable one, that no order of reference or report were ever made.

Those defects, however, are by no means the principal circumstances that tend to create distrust as to its genuineness. Much graver difficulties than any suggested by the defects of the document arise, from what appears affirmatively, on its face. Both the petition and the decree of concession refer to the report of the Alcalde of Sonoma; and the language of the latter plainly imports that it was founded, in part at least, upon a report of that magistrate. No such report, so far as appears, was made by that officer, in connection with the espediente under consideration. He never made but one report, and that, as clearly appears, was adverse to the application, and was made to Micheltorena on the twenty-sixth day of January, 1844, in which he stated that the land solicited was occupied by virtue of a concession from the Governor in favor of another individual.

Looking at the terms of the report, it is clear that it is not to that report, as originally framed, that reference is made, either in the petition or the decree of concession. On the contrary, it is evident that they both refer to a *favorable* report, and not to one that was *adverse*, which entirely negatives the theory that the informé previously made and on file was carried into this espediente. To suppose that the Governor referred to an informé that never had any existence, is a theory that cannot be adopted, as it would impute to him an inconsistency little better than a fraud upon the Government. Some other theory, therefore, must be adopted, to explain the transaction. Referring to the record, it appears that Jacob P. Leese was the Alcalde who made that report, and he was examined as a witness in behalf of the United States. He testified that

the words *una parte de ello*, translated, a part of it, now appearing at the close of the report, were inserted by him on the eighth day of October, 1847, at the solicitation of the claimant's intestate. That alteration in the informé was made, as he states, in the presence of the individual who, according to his original report, was in the occupation of the land by virtue of a concession from the Governor. Two certificates were also introduced by the claimant, which go very far to confirm the statements of the witness, both as to the time when the addition was made to the informé, and the attending circumstances. One of those certificates is signed by the witness himself, in which, after referring to the informé, he states, in effect, that he has discovered, since he made that report, that the statement therein made, that the land was occupied by another individual, was erroneous; and the other certificate is signed by the person referred to in the informé as the occupant of the land; and he certifies that the land solicited, if "regulated to the plan," would not interfere with his possession. These certificates bear date on the eighth day of October, 1847, and the witness testifies that he made the alteration in the informé at the time he gave that certificate. Micheltorena was driven from power in 1845, and on the tenth day of August, 1846, Pio Pico fled from the city of Los Angeles, and never afterwards had possession of the archives or records of the department. Before his flight, he placed them in boxes, and deposited them with Luis Vignes for safe-keeping. On the thirteenth of that month, Commodore Stockton entered the city of Los Angeles, and on the next day Colonel Fremont took possession of the archives, and kept them until the eighth day of September following, and then took them to Sutter's fort, on the American river, where they remained until 1847, when they were sent to Monterey. They remained at Monterey until February, 1850, when they were sent to Benicia, and thence to the office of the Surveyor General. Whatever might have been the motive for making the alteration in the informé, it is clear that it could not have been done to influence the official action of the Governor, for he had long before gone out of office; and yet the circumstances strongly support the hypothesis that it was to

that same report, as altered on the eighth day of October, 1847, that the reference is made, both in the petition and the decree of concession embraced in the espediente. Assuming that to be so, then it is clear that the espediente is ante-dated and fraudulent; and the circumstances, when taken together, tend so strongly in that direction, that we think the espediente is not entitled to much weight. When the jurisdiction of that department was transferred to the United States, the motive to fabricate titles to real property became strong and active, and the evidence in this case is abundantly sufficient to show that opportunities occurred to enable the unscrupulous to foist simulated evidences of such titles into the depositories of the archives, after they were seized at Los Angeles, in spite of any vigilance that those intrusted with their safe-keeping could possibly employ to preserve them from such fraudulent practices. Interested parties were necessarily allowed to consult the contents of the packages while they yet remained in very considerable disorder, and without any permanent custodian. Among those who had such opportunities was one of the witnesses of the claimant, and the evidence tends to show that he had an interest in the claim, and that he had stated that when he took hold of it there were no papers in the case, but that he had procured a set as good as any that could be found in the State. True it is that he denies ever having made that statement; but he admits that he went to Benicia in 1850, and that he examined the archives for the purpose of ascertaining whether any grant had been made to the claimant's intestate. He says he saw papers there with the name of William Knight on them, but neither he nor the clerks in charge of them could translate them. Whether the espediente in this case was in the boxes that fell into the possession of Colonel Fremont at Los Angeles, or was among the loose papers subsequently found in the custom-house at Monterey, or when or by what means the espediente was deposited in the archives, does not appear, except that it was there in 1847, or the first part of the year 1848, when an officer of the United States, in charge of the archives, made and completed an index of certain espedientes, not previously indexed, numbered, or filed, by Mexican au-

thority.   Sixty-seven, including all those found in the custom-house at Monterey, were then added to the previous list.   Mexican numbering stopped at five hundred and twelve, and the author of the new index commenced to number where the other closed.   That index includes the espediente in this case as number five hundred and fifty, and it shows that the espediente was in the archives when that index was made; but it shows nothing more, and cannot in any sense be regarded as a Mexican record.   Evidence to show that the grant was recorded is entirely wanting; and there is no pretence that the espediente was ever submitted to the Departmental Assembly for its approval.   Absence of such approval, under the circumstances of this case, is entitled to very considerable weight. More than forty espedientes were presented to that assembly on the third and tenth days of June, 1846, and received its approval.   Several of the grants were dated in April, 1846, and one was dated on the first day of May of that year, and the inference is a reasonable one, that if the espediente in this case had really been completed, and the grant actually issued, the former would have been included in that list.   Taken together, these various considerations throw great distrust upon this document, and justify the conclusion that it is entitled to little or no weight.   Rejecting the espediente as unsatisfactory and wholly insufficient, under the circumstances, nothing remains to support the claim in this case except the parol proof.   Claimant's theory is, that the grant was issued by Governor Pio Pico at Los Angeles on the fourth day of May, 1846, and was then and there delivered to his intestate.   At that time William Knight lived in the valley of the Sacramento, some seven hundred miles distant from the seat of Government, where it is assumed that the grant was issued; but it is insisted that he visited that place the last of April or early in May of that year, and that the grant was delivered to him in person by the Secretary of the Department.   José M. Moreno was the Secretary at that time, and he testifies that the grant was issued by the Governor on that day, and that he, the Secretary, delivered the same to the claimant's intestate.   But it is a sufficient answer to the testimony of that witness to say, that it is con-

ceded by the claimant, that his character for truth is worthless.

Another witness, James M. Harbin, testifies, that he saw William Knight in Los Angeles about that time, and that he said he was there for the purpose of getting a grant for ten leagues of land on the Sacramento river; that Governor Pio Pico told him that he had issued the grant, and that he, the witness, saw papers in the possession of Knight when he started to return, but did not know what they were. Proof was also introduced by the claimant to show that the signatures to the marginal decree and the decree of concession were genuine; and he also introduced an affidavit of J. C. Davis, in which the affiant states that, on the 5th day of June, 1846, he heard Knight say, in the camp of Colonel Fremont, that he had just returned from the lower country, where he had procured his title papers; and the affiant also stated that he exhibited certain papers, calling them title papers, but the witness did not examine them, because he could not read the language. Other declarations of Knight were also introduced without objection—such as, that he, at one time, said he was going to Los Angeles, concerning the title to his land, and that, on his return, he said he had received it; and that, in March, 1847, he said he had lost his grant, and expressed his fears that he should lose his land in consequence of the loss of the grant. It was denied by the United States that he made any such visit to Los Angeles as is alleged; and they also insisted that he never claimed to have any other title to the land than the copy of the general title, which was furnished him on the fifteenth day of April, 1845; and a large number of witnesses were examined to establish these points. They prove that, whenever he spoke of having a title to the land, he uniformly spoke either in vague terms, or else referred directly to the general title, and never, in a single instance, declared that he had a grant of the land from the last-named Governor. They also prove that he was at home during the winter and spring of that year, and that in the month of April he was engaged, to some extent, in agricultural pursuits. One witness states, that he saw him on his ranch about the eighteenth or twen-

tieth of that month; and another, that he saw him at his house about the first of May of the same year, and states the circumstances that enable him to fix the time with certainty. Two other witnesses, one a boarder in his house, and the other a neighbor, state, with great positiveness, that he was at home in the early part of May, sometimes hunting and sometimes farming, until he joined Colonel Fremont on the twenty-sixth day of that month. Testimony was also introduced by the United States, showing that great difficulties would have attended such a journey at that season of the year, on account of the swollen state of the streams and the condition of the roads; and some of the witnesses, who were well acquainted with the usual route, express the opinion that the journey, in the ordinary course of travelling, could not have been accomplished short of a month. These and many other facts were given in evidence to show that he did not visit Los Angeles at the time alleged; and clearly the weight of the evidence, to say nothing of the improbability that the Governor would bestow such a bounty upon one so recently in arms against him, is clearly against the theory set up by the claimant. Suppose it were competent for the appellee to prove his claim without record evidence, still the burden is upon him to show that the grant was issued; and surely he must first show its existence and loss before he can be allowed to give secondary evidence of its contents. Applying that elementary rule to the facts of this case, and it is clear that the claimant has no standing in court. But a more decisive answer to the claim remains to be stated, and that is, that there is no record evidence that the grant was ever issued, and without such evidence the claim cannot be confirmed. That rule is founded upon the Mexican law, and has been so repeatedly announced by this court that it seems unnecessary to adduce any argument in its support. To maintain a title by secondary evidence, say the court, in *United States* vs. *Castro et al.,* (24 How., 350,) the claimant must show that the grant was obtained and made in the manner the law required, at some former time, and that it was recorded in the proper public office; to which it may be added, that such was undoubtedly the Mexican law, and that the rule

there laid down is plainly applicable to the present case. Similar views have been expressed by this court on so many occasions that it would be a work of supererogation to do more than to refer to the decided cases. *United States* vs. *Teschmaker*, (22 How., 392;) *United States* vs. *Fuentes*, (22 How., 443;) *United States* vs. *Cambuston*, (20 How., 59;) *United States* vs. *Osio*, (23 How., 279, 280.)

Evidence was also introduced by the claimant tending to prove that a book of records appertaining to land titles in California, for the year 1846, was lost; but no attempt was made to show that the grant in question was ever recorded in that book. All we think it necessary to say upon that subject at the present time is, that proof of such a loss cannot avail a party in a case like the present, unless it also be shown, at least by circumstances which will justify the court in finding the fact, that the grant was duly and properly entered in the lost record. In view of the whole case, we are of the opinion that the District Court erred in confirming the claim. The decree must accordingly be reversed, and the cause remanded, with directions to dismiss the petition.

Mr. Justice WAYNE. I content myself now with saying that I do not concur with the court in its conclusion in this case. I think it a severer exclusion of a right of property in land secured by treaty than has been hitherto adjuged by this court in any case from California.

*Decree of the Circuit Court reversed and cause remanded, with directions to dismiss the petition.*